**PVM REDWOOD COMPANY, INC.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 80–4096.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1981.

Decided Sept. 13, 1982.

Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 731.

Leon J. Karjola, Rowland & Karjola, Eureka, Cal., for plaintiff-appellant.

Maria Arevalo Iizuka, Dept. of Justice, Washington, D. C., for defendant-appellee.

* Honorable Robert Van Pelt, Senior United States District Judge for the District of Nebraska, sitting by designation.

1. In Count II of its complaint PVM alleged that the United States had appropriated from PVM

Before MERRILL and ALARCON, Circuit Judges and VAN PELT *, District Judge.

MERRILL, Circuit Judge:

PVM Redwood Company, Inc. appeals the dismissal of its action for failure of its complaint to state a claim upon which relief could be granted.

PVM operates a sawmill. In its complaint it alleged that passage of the Redwood Park Expansion Act, Pub.L.No.95–250, 92 Stat. 163, 16 U.S.C. § 79b *et seq.*, caused a taking of its property by the United States for which it is entitled to compensation under the Fifth Amendment of the United States Constitution. The District Court ruled that from the allegations of the complaint it was clear that no property right held by PVM had been taken by the Government. We agree.

The nature of PVM's alleged property right appears from Count I of its complaint. It is there alleged that under authority granted by the Act the Secretary of the Interior had acquired for the United States timber lands owned by those who had in the past supplied 98% of PVM's requirements; that this had made it impossible for them to continue to meet PVM's needs. The complaint stated:

"Prior to and during the 1977 calendar year, Plaintiff contracted and received from Louisiana-Pacific Corporation and Simpson Timber Company, ninety-eight percent (98%) of its raw materials * * *.

That after the passage of the Redwood National Park Expansion Act, Plaintiff's suppliers informed Plaintiff that they could no longer furnish said raw materials which amounted to ninety-eight percent (98%) of Plaintiff's total production * * * ".

As a consequence, it is alleged, PVM suffered an increase in production costs through a need to deal with an inferior grade of lumber and the need to retool and purchase new machinery in order to deal with that raw material.[1]

a "personal property interest" and had "interfere[d] with [its] ongoing contracts for supply." Because these allegations refer to the interest specified in Count I, we need not address them separately.

PVM has failed to distinguish between "appropriation of property and the frustration of an enterprize by reason of the exercise of a superior governmental power." *United States v. Grand River Dam Authority*, 363 U.S. 229, 236, 80 S.Ct. 1134, 1138, 4 L.Ed.2d 1186 (1960). PVM has not been denied use of its property; it can still run its sawmill. It had no ownership interest in its source of supply. As the Supreme Court stated in *Grand River, supra*, 363 U.S. at 236, 80 S.Ct. at 1138:

> Here respondent has done no more than prove that a prospective business opportunity was lost. More than that is necessary as *Omnia Co. v. United States*, 261 U.S. 502 [43 S.Ct. 437, 67 L.Ed. 773] [1923], holds. In that case the claimant stood to make large profits from a contract it had with a steel company. But the United States, pursuant to the War Power, requisitioned the company's entire steel production. Suit was brought in the Court of Claims for just compensation. The Court, after pointing out that many laws and rulings of Government reduce the value of property held by individuals, noted that there the Government did not appropriate what the claimant owned but only ended his opportunity to exploit a contract. "Frustration and appropriation are essentially different things." *Id.*, at 513 [43 S.Ct. at 439].

It is not clear from PVM's complaint that existing contracts had been frustrated. Rather it would seem that what had been frustrated was an expectancy based on past experience that contracts would be entered into. *Grand River* applies *a fortiori*.

We conclude that PVM "can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*

*v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted), and that dismissal of this action was proper.[2]

Finally PVM contends that the court erred in holding what PVM describes as an evidentiary hearing before dismissing its complaint on the pleadings. It argues that in holding a hearing, the court effectively converted the Government's Rule 12 motion to dismiss on the pleadings into a motion for summary judgment under Rule 56 and accordingly should have provided PVM with notice and an opportunity to present pertinent material.[3]

We do not agree with PVM's characterization of the events below. While the court did engage in a brief colloquy with counsel for PVM (six pages of transcript), it did nothing to elicit evidence outside the pleadings; rather, it merely attempted to clarify the allegations of PVM's complaint.

JUDGMENT AFFIRMED.

ALARCON, Circuit Judge, dissenting.

I respectfully dissent. I would reverse the order dismissing the complaint and direct the district court to permit PVM to attempt to amend the pleading to state its claim in a clear and concise manner. I believe that PVM has set forth facts which establish that its property has been taken by the government.

I am in complete agreement with my colleagues' fine analysis and rejection of PVM's statutory claim for relief. I do not agree with the majority's interpretation of PVM's constitutional claim.

---

**2.** PVM also contends that it is entitled to compensation under the terms of the Redwood Park Expansion Act since it is among the class of "affected mill employers" mentioned in the statute. Pub.L.No.95–250, sec. 201(8), 92 Stat. 173 (section not codified in U.S.C.). This argument is without merit. The Act defines affected mill employers for purposes of determining those *employees* eligible for assistance under the Act. *See* Pub.L.No.95–250, sections 203 *et seq.*, 92 Stat. 175 *et seq.*

**3.** In this regard, Rule 12(c) provides:

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

## I.

### THE STATUTORY CLAIM

PVM argues that since the Expansion Act provides for employees, whose livelihoods were lost as a result of the act, it should be read to provide as well for timber industry employers who have lost their source of supply. The language of the act simply does not support this theory.[1] The history of the act does not suggest that Congress proposed that timber industry landowners whose lands were not taken under the act should be compensated for the loss of their supply of redwood lumber or for the consequent losses to their business and property interests. There also is no reason for us to imply that such a remedy exists under the act. This court should not infer a legislative intent to compensate interests not covered explicitly by the Expansion Act. *See Mitchell v. United States*, 267 U.S. 341, 346, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1925).

The Expansion Act does provide a remedy for some losses which would not otherwise be compensable under the fifth amendment—the loss of the livelihood of lumber industry employees. Thus, Congress obviously knew how to provide for consequential losses, yet failed to do so in the case of lumber industry employers. Congress' omission, rather than an oversight, would appear to be an intentional decision to limit the benefits for consequential injuries arising under the Expansion Act. That Congress could have, but chose not to, afford a remedy to employers such as PVM does not give us the power to rectify the situation. The Supreme Court has repeatedly invited Congress to provide for consequential damages. *See, e.g., United States v. General*

---

1. Section 79c(b)(2) provides that the United States will pay just compensation to the owner of *real* property. 16 U.S.C. § 79c(b)(2) (Supp. III 1979) (emphasis added). Thus, the act does not provide compensation for owners of personal property.

2. The majority noted that, under Arkansas law, a deed to growing standing timber which authorizes the grantee to cut and remove the trees within a specified time, is a conveyance of an interest in real property. If the option to enter the lands and cut the standing timber

*Motors*, 323 U.S. 373, 382, 65 S.Ct. 357, 361, 89 L.Ed. 311 (1944). Since the Act does not provide a remedy, the dismissal under this basis was appropriate.

## II.

### THE CONSTITUTIONAL CLAIM

It is my view that PVM has pleaded sufficient facts to establish a constitutional claim for the taking of its "on-going contracts" for raw materials without just compensation. Because PVM alleges that the government has taken from it a personal property interest without just compensation, and the government is deemed to have admitted this for purposes of the motion to dismiss, I would remand the cause for further proceedings to determine whether PVM in fact has a personal property interest in the raw materials allegedly taken. *See American Savings & Loan Ass'n v. County of Marin*, 653 F.2d 364, 372 (9th Cir. 1981); *Cf. United States v. 3,305.73 Acres of Land, More or Less Situated in Monroe County, State of Arkansas*, 650 F.2d 938 (8th Cir. 1981) (the majority examined an instrument entitled "An Option to Purchase Standing Timber" to determine that it gave the optionee a compensable interest in the condemned lands of third persons);[2] *City of Oakland v. Oakland Raiders, Ltd.*, 32 Cal.3d 60, 64–68, 646 P.2d 835, 838, 841, 183 Cal. Rptr. 673, 676–678 (1982) (for eminent domain purposes neither federal nor state constitution distinguishes between property which is real or personal, tangible or intangible; California eminent domain law authorizes compensation for the taking of intangible property); *County of San Diego v. Miller*, 13 Cal.3d 684, 532 P.2d 139, 119

---

gave equitable legal title to the standing timber, the majority reasoned, it would constitute an interest in real property which, under Arkansas law, would entitle the plaintiff to a compensation award. Since the contract described a particular property and provided some certainty of measuring the item that was to be removed from the property, the court construed it as such an interest. The dissent, however, called it a bare option contract to purchase timber and construed the contract for a sale of goods as not being a protectable property interest.

Cal.Rptr. 491 (1975) (California Supreme Court examined features of option contract to determine that an unexercised option to purchase land is a compensable property interest for condemnation purposes); *see generally* Wright and Miller, 5 Fed. Practice and Procedure § 1250 (1969). If under California law PVM has a personal property interest in the raw materials for which it has contracted, then the trier of fact must balance the competing interests to determine whether PVM is entitled to compensation.

### A. The Allegations of the Complaint.

In reviewing a motion to dismiss a complaint for failure to state a claim, our function is to determine whether the plaintiff can prove *any* facts in support of its claim that would entitle it to relief. We must construe the pleadings in a light most favorable to the plaintiff to determine whether the allegations of the complaint, if true, would be sufficient to constitute a claim upon which relief might be granted. *Bouse v. Bussey*, 573 F.2d 548, 550 (9th Cir. 1977). Thus, in the matter before this court, we may affirm the district court's order of dismissal only if, as a matter of law, PVM cannot prove any set of facts in support of its claim.

In viewing the complaint, it is important to bear in mind that the objective of the Federal Rules of Civil Procedure is to avoid technicalities. *See generally,* Wright and Miller, 5 Fed. Practice and Procedure § 1202 (1969). As the Supreme Court has described, the modern philosophy of the federal rules requires:

> "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.
>
> ... The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Conley v. Gibson*, 355 U.S. 41, 47–8, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80 (1957) (citations omitted); *accord Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353, 1359 & n.9 (9th Cir. 1977) (this court found that the allegation of "taking," even though phrased in terms of inverse condemnation, was sufficient to show that appellants complained that the Tahoe Regional Planning Authority "exercised its police powers improperly, and that they relied on the due process clauses of the Fifth and Fourteenth Amendments."), *aff'd in part and rev'd in part on the grounds, Lake County Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979).

The function of pleadings is to give the opposing party fair notice of the nature and basis or grounds of the claim, and a general indication of the type of litigation involved. *See Ross Island Sand & Gravel Co. v. General Ins. Co. of America*, 472 F.2d 750, 752 (9th Cir. 1973). The discovery process bears the burden of filling in the details. *Id.* (in federal practice, plaintiffs need not allege all the facts giving rise to their causes of action, but may elect to assert their claims in broad, general terms; the parties then resort to interrogatories, requests for admissions, and the like to flesh out pretrial orders that will provide the trier of fact with a simple statement of the issues of law and fact remaining to be resolved in court). "[I]t is axiomatic that the allegations must be read as a whole, and ... viewed broadly and liberally...." *Ostrofe v. H. S. Crocker Co. Inc.*, 670 F.2d 1378, 1381 (9th Cir. 1982) (quoting Wright and Miller, 5 Fed. Practice and Procedure § 657).

My colleagues' construction of PVM's complaint does not square with these legal principles. The majority has determined, by looking solely to Count I of the complaint, that PVM has "no ownership interest in its source of supply" because "[i]t is not clear from PVM's complaint that existing contracts had been frustrated." *Ante* at 1329. The majority concludes that the dismissal of PVM's complaint must be upheld because "it would seem that what had been frustrated was an expectancy based on past experience that contracts would be entered into ..." *Ante* at 1329. I disagree.

It appears to me that the factual allegation in Count II clarifies any possible ambiguity in Count I as to whether PVM had existing contracts for raw materials. In Count II, PVM alleges that its personal property interest has been legislatively taken. "As a direct and proximate result of Defendant's taking of Plaintiff's business interest and interference with Plaintiff's ongoing contracts for supply of Plaintiff's raw materials," PVM asserts that it has suffered increased costs. Reading the allegations of the complaint as a whole, and viewing them broadly and liberally, I cannot conclude as the majority has, that "a mere expectancy based on past experience" has been frustrated. Rather, what remains at this juncture to be proven is whether PVM in fact has a personal property interest in the raw materials for which it contracted. If PVM has such an interest, then, neither *Omnia* nor *Grand River* has any applicability to the complaint at issue here. Unlike the majority, I am unable to conclude that, as a matter of law, PVM has no ownership interest in the timber for which it contracted.

## THE JUST COMPENSATION CLAUSE

The fifth amendment provides in part "[N]or shall private property be taken for public use, without just compensation."

Taking jurisprudence has evolved historically from an approach based on physical definitions of "property" and "taking" to one based on considerations of "fairness and justice." Current interpretations embrace a balancing process in which competing interests are weighed to determine whether society, rather than the individual, should bear the cost of governmental injury to property.

Originally, property in the just compensation sense connoted land or some other tangible object of ownership. *See*, Cormack, *Legal Concepts in Cases of Eminent Domain*, 41 Yale L.J. 221, 229 (1931). Current notions of property adopt a "bundle of rights" analysis—that is, an analysis based on the notion of a set of legal relations or relationships among persons with respect to things. *See, e.g., Kaiser Aetna v. United States*, 444 U.S. 164, 179, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979); *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979); *General Motors Corp. v. United States*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945); Introductory Note to Restatement of Property ch. 1 (1936); Oakes, *"Property Rights" in Constitutional Analysis Today*, 56 Wash.L.Rev. 583, 588–90 (1981); Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165, 1185 n.41 (1967). These rights include, among others, the right to possess, use, and dispose of property, and to exclude others from using property. *See, e.g., Kaiser*, 444 U.S. at 179, 100 S.Ct. at 392; *Andrus*, 444 U.S. at 66, 100 S.Ct. at 327; *General Motors Corp.*, 323 U.S. at 378, 65 S.Ct. at 359; *Oakes* at 589. Thus, while in the generic sense, property refers to land, possessions, and incorporeal entitlements,[3] *Oakes* at 588, the concept of property also embodies the "fruition of a number of expectancies." *Kaiser*, 444 U.S. at 179, 100 S.Ct. at 392. If these expectancies are deemed "sufficiently important," the government must condemn and pay for them before acquiring or overtaking them. *Id.*

Recent Supreme Court cases have also signaled a change in the concept of "taking." Prior definitions of taking required a physical act such as invasion or direct appropriation of property. *See, e.g., United States v. Causby*, 328 U.S. 256, 261–62, 66 S.Ct. 1062, 1065–1066, 90 L.Ed. 1206 (1946); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 510, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923). *But see, Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (court invalidated statute which destroyed all rights in subject

---

**3.** *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 10–11, 16, 69 S.Ct. 1434, 1440–1441, 1443, 93 L.Ed. 1765 (1949); *Liggett & Myers v. United States*, 274 U.S. 215, 220, 47 S.Ct. 581, 582, 71 L.Ed. 1006 (1927); *West River Bridge* *Co. v. Dix*, 47 U.S. 507, 533, 12 L.Ed. 535 (1848); *Porter v. United States*, 473 F.2d 1329, 1333–35 (5th Cir. 1973); 1 *Nichols on Eminent Domain* § 2.1[z] .at 2–8—2–9 (3d ed. 1980).

property and contract; court recognized that if a regulation of property "[g]oes too far it will be recognized as a taking," however, *Mahon* did not involve compensation for taking). The Court's current definitions of a taking no longer require the transfer of physical control over a portion of property. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 n.35, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Rather than establishing a "set formula" to determine when a taking has occurred that requires compensation, the Court has identified several significant factors, distilled from past cases, to be weighed in an "essentially ad hoc factual inquir[y]." *Kaiser*, 444 U.S. at 175, 100 S.Ct. at 390. *Id.* The factors to be weighed to determine when "justice and fairness" require compensation for a taking are: (1) the economic impact of the regulation; (2) its interference with reasonable investment-backed expectations; and (3) the character of governmental action. *Id.*

Thus, a taking will be found if the interest is one which the law will protect, and the interference with this interest is of sufficient magnitude to cause the conclusion that fairness and justice as between the government and a citizen require the burden to be borne by the public. *Devines v. Maier*, 665 F.2d 138, 141–44 (7th Cir. 1981). This conclusion, the Supreme Court has admonished "ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus*, 444 U.S. at 65, 100 S.Ct. at 326.

> [G]overnmental regulation by definition involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use of the economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in general law." (citations omitted.)

The Takings Clause preserves the governmental power to regulate, subject only to the dictates of "justice and fairness."

(citations omitted.) There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate....

*Id.*

To a great extent, whether a regulation of private property rights for a public purpose constitutes a taking depends on the extent of its interference with the private property right. *Devines v. Maier*, 665 F.2d 138, 141 (7th Cir. 1981). The court's inquiry as to the extent of a regulation's interference with a private property right has focused on the use of the property that is permitted. *See, e.g., Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–327, 62 L.Ed.2d 210 (1979); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 131, 136, 138 n.36, 98 S.Ct. 2646, 2665, 2666 n.36, 57 L.Ed.2d 631 (1978). That a regulation may prevent the best or most profitable use of the property does not necessarily mean that a taking has occurred. *Andrus v. Allard*, 444 U.S. at 65–66, 100 S.Ct. at 326–327; *Penn Central Transportation Co. v. New York City*, 438 U.S. at 138 n.36, 98 S.Ct. at 2666 n.36. Regulations in the form of zoning ordinances or land use regulations which have decreased property values as much as seventy-five percent, *e.g., Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and eighty-eight percent, *e.g., Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), have not been found to be takings of property.

I believe that it is possible to harmonize *Omnia* and *Grand River*, the cases relied upon by the majority, with recent developments in taking jurisprudence.

In both cases, the respective claimant's asserted interest in property was the right to do something with it in the future. In *Omnia*, the claimant acquired a contractual right to purchase steel in the following year; in *Grand River Dam* the claimant, by franchise, acquired the right to develop electrical power.

In both cases, each claimant stood to gain large profits but the government's taking occurred before either claimant had exploit-

ed the right to do something in the future. Consequently, the Court characterized both cases as requesting compensation for lost opportunities. In the language of current taking jurisprudence, the governmental action did not cause either claimant to lose any reasonable "distinct investment backed expectation." *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (the Court held that if the government allowed the public access to a private pond leased and improved by the petitioner then the government would have to compensate the petitioner for the loss of petitioner's right to exclude others from the pond; the government action would interfere with distinct investment-backed expectations because petitioner had expended large sums of money to develop a marina on the pond that connected the pond to a navigable bay and the Pacific Ocean).

Later cases distinguishing *Omnia*, have focused on the claimant's present interest in the thing taken by the government. *See, e.g., Armstrong v. United States*, 364 U.S. 40, 48–49, 80 S.Ct. 1563, 1568–1569, 4 L.Ed.2d 1554 (1960); *International Paper Co. v. United States*, 282 U.S. 399, 407–408, 51 S.Ct. 176, 177–178, 75 L.Ed. 410 (1931). *See also, Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473, 476 n.3, 93 S.Ct. 791, 794, 796 n.3, 35 L.Ed.2d 1 (1973) (lessee of an unexpired lease without the right to renew is entitled to compensation for the market value of improvements made without regard to the term of the lease because of lessee's expectancy that lease would be renewed; lessee was not seeking compensation for lost opportunities as in *Omnia*) [4]. *International Paper Co.* and *Armstrong* illustrate this distinguishing factor.

In *International Paper Co.*, the petitioner, by conveyance and lease, was entitled to draw and use water from a power canal—a corporeal hereditament and real estate under New York law—"owned" by a power company. The United States requisitioned all electrical power output that the power company could produce through the use of its water, including water capable of being diverted through its canal, and it promised to compensate the power company. In upholding the petitioner's right to compensation, the Court first identified the petitioner's right to use the water. The Court then reasoned that since the government withdrew and diverted all the water that the petitioner was entitled to use, the government had taken petitioner's right to use the water. Distinguishing *Omnia*, the Court noted that the government took property that the petitioner owned as fully as it took the property of the power company which owned the residue of the water and power and the canal.

In *Armstrong*, the United States entered into a contract with a shipbuilding corporation for the construction of boats. The contract provided that, in the event of default by the company, the government could terminate the contract and require the company to transfer the title and deliver to the government all completed and uncompleted work together with all the manufacturing materials acquired by the company for building boats. The petitioner furnished various materials for use in construction of the boats. When the company defaulted the government exercised its option and took the materials. The petitioner who had supplied the materials for the shipbuilding claimed that the government took his property without just compensation.

The Supreme Court agreed. The Court recognized that "not every destruction or injury to property by government action has been held to be a 'taking' in the constitutional sense," citing *Omnia*, but that *Omnia* and other cases revealed "the difficulty of trying to draw the line between what destructions of property by lawful governmental actions are compensable 'takings' and what destructions are 'consequential' and therefore not compensable." 364 U.S.

---

4. When viewed in this context, the notion that frustration and appropriation are different things, *Omnia*, 261 U.S. at 513, 43 S.Ct. at 439; *Grand River*, 363 U.S. at 236, 80 S.Ct. at 1138 (1960) is consistent with views expressed in recent taking cases. It is also consistent with the California definition of ownership of property as the right to possess it and use it to the exclusion of others. Cal. Civil Code § 654 (West 1954).

at 48, 80 S.Ct. at 1568 (citations omitted). In determining that a compensable taking had occurred, the Court first looked to the applicable state law to identify petitioner's interest. The state law provided that suppliers become entitled to a lien when they furnish supplies. The Court concluded the lien was a compensable interest.

In determining that a compensable interest had been taken, the Court pointed out that before the United States compelled the shipbuilder to transfer the materials, the petitioner had a valid lien under state law. After transfer, the liens, although valid, were unenforceable because of the government's asserted sovereign immunity. The destruction of all of petitioner's property rights under the liens resulted in a taking of the liens that required compensation, as opposed to a mere consequential incidence of a valid regulatory measure. 364 U.S. at 48, 80 S.Ct. at 1568.

PVM'S ASSERTED PROPERTY INTEREST

As this court noted in *Weiss v. Lehman*, 642 F.2d 265, 267 (9th Cir.), *vacated on other grounds*, 454 U.S. 807, 102 S.Ct. 80, 70 L.Ed.2d 76 (1981), the fifth amendment's just compensation clause is a substantive right of a person whose property is taken by the government whether the property is real or personal. The meaning of property in fifth amendment compensation cases may be determined by the law of the state in which the property is located. *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977); *see also, Pruneyard Shipping Center v. Robons*, 447 U.S. 74, 84, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980) ("... the United States, as opposed to the several states, [is not] possessed of residual authority that enables it to define 'property' in the first instance.") *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554

(1960) (Court looked to state law to determine property interest); *Thibodo v. United States*, 187 F.2d 249 (9th Cir. 1951) (this court looked to state law to determine property interest); *United States v. Puget Sound Power & Light Co.*, 147 F.2d 953 (9th Cir. 1945) (this court looked to state law to determine property interests).

As noted earlier, my view is that this matter must be remanded because PVM's allegation that the government has taken PVM's personal property interest (its "ongoing contracts" for timber) must be accepted as true. I would direct that, on remand, the district court examine the contract with reference to California law to determine whether in fact PVM has an interest in the timber for which it contracted. *See Thibodo v. United States*, 187 F.2d 249 (9th Cir. 1951); *United States v. Puget Sound Power and Light Co.*, 147 F.2d 953 (9th Cir. 1945). In *Thibodo*, we noted that, under California law, a lienholder has a present property interest in the subject matter of land taken by eminent domain. In *Puget Sound*, we again looked to state law to determine that the franchise there was a compensable property interest. Similarly here, under California law, PVM may have a personal property interest in the timber for which it had contracted.

California law provides that "ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property." Cal. Civil Code § 654 (West 1954). The Commercial Code states that a contract for the sale of timber to be severed is a contract for the sale of goods. Cal. Commercial Code 2107(2) (West Supp.1981). By identification [5] the parties can effect a present sale before severance,[6] *id.* and the buyer can obtain a special property and an insurable interest in goods. Cal. Commer-

---

**5.** Cal. Commercial § 2107 (West Supp. 1981). Section 2501(1)(a)–(c) (West 1964) describes how and when an identification can be made.

**6.** "A 'sale' consists in the passing of title from the seller to the buyer for a price. A 'present sale' means a sale which is accomplished by the making of a contract." Cal. Commercial

Code § 2106(1) (West 1964). The contract for sale may be executed and recorded in the same manner as a document transferring an interest in land, and it shall then constitute notice to third parties of the buyer's rights under the contract for sale. Cal. Commercial § 2107(3) (West Supp. 1981).

cial Code § 2501 (West 1964). Since it is by identification that the parties can effect a present sale and that the buyer can obtain a special property interest in goods, I believe that the district court should examine the contract to determine whether such an identification has occurred. The contract for timber may have given PVM the present right to possess and use the timber to the exclusion of others.

If it is determined that PVM has property interest in the timber, then this interest must be considered in the balancing process to determine if it is one which has been constitutionally taken and therefore is compensable. This process requires an application of the factors discussed earlier—the impact of the Expansion Act, the nature and extent of its interference with reasonable investment-backed expectations, and the character of the governmental action—to determine whether justice and fairness require that the public rather than PVM bear the burden imposed. *See, supra* pp. 1332–1333; *Devines v. Maier,* 665 F.2d 138, 141–44 (7th Cir. 1981).

In sum, I would remand the matter to the district court because I believe that the nature of PVM's interest may be easily determined on a summary judgment proceeding.

If reasonable persons differ as to their reading of this complaint, then, in my view, the plaintiff should be given the opportunity to clarify the meaning—either by amendment or by further evidentiary proceedings. This court should not deprive a plaintiff of his or her day in court by adhering to strict pleading rules that are inconsistent with the objectives of the Federal Rules of Civil Procedure and the modern philosophy of pleading.